UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RYAN BOSHAW,

      Plaintiff,                                  Case No. 19-CV-13656
                                                   Honorable Thomas L. Ludington

v.

MIDLAND BREWING COMPANY,
DONNA REYNOLDS, and DAVE KEPLER,

      Defendants.

_____/

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DENYING DEFENDANTS' REQUEST FOR ATTORNEY FEES, AND DISMISSING
CASE**

      Plaintiff, Ryan Boshaw, filed a five-count complaint against Defendants Midland Brewing

Company, Donna Reynolds, and Dave Kepler on December 12, 2019. ECF No. 1. Two months

later, Mr. Boshaw filed an amended complaint. ECF No. 9. He alleges that Defendants

discriminated against him because of his sexuality while he was employed by the Midland Brewing

Company ("MBC") and then terminated his employment because of his sexuality in violation of

Title VII and Michigan's Elliott Larsen Civil Rights Act ("ELCRA"). *Id.* He also alleges that

Defendants Reynolds and Kepler violated the ELCRA through a civil conspiracy to terminate his

employment based of his sexuality. *Id.*

      On November 30, 2020, Defendants filed a motion for summary judgment. ECF No. 16.

Response and reply briefs were timely filed. ECF Nos. 19, 20. For the following reasons,

Defendants' Motion will be granted.

## I.

## A.

MBC hired Plaintiff Ryan Boshaw on March 2, 2018 to work as a server. ECF No. 16-4 at PageID.220. Over the next 15 months, he was promoted multiple times, ultimately to the position of Front of House ("FOH") Operations Manager. *See infra* I.B. Once promoted to FOH Operations Manager, his direct supervisor was Defendant Donna Reynolds, the Restaurant Manager. ECF No. 16 at PageID.124–25. Defendant Dave Kepler is the majority owner of MBC. *Id.*

Prior to his time at MBC, Plaintiff worked for numerous restaurants in the Midland, Michigan area. At the time of his deposition, Plaintiff had celebrated being sober for four years. ECF No. 16-4 at PageID.194–97. On his MBC application, Plaintiff explained that he left multiple restaurants due to professional growth and career opportunities, because "you can't really put that I was terminated for sobriety reasons on an application for a job when you're trying to get your life together." ECF No. 16-4 at PageID.202–03. He also testified that he did not want MBC to know about his prior terminations. *Id.* at PageID.205.

## B.

Plaintiff alleges that after working at MBC for a few months as a server, he and Reynolds discussed his sexual orientation and masculine appearance. Plaintiff testified that Reynolds told him in July 2018 that he would not be promoted unless he removed his relationship status from Facebook and changed his appearance. ECF No. 16-4 at PageID.234; *see also* ECF No. 9 at PageID.48 "([Reynolds] then suggested that Plaintiff remove his relationship status from his facebook page, remove visible piercings, and style his hair differently. The cumulative effect of these changes would be to hide his status as a homosexual, and appear more stereotypically masculine.").

- 2 -

As Plaintiff explained during his deposition,

> [Reynolds] told me that I need[ed] to act more masculine and appear to be more masculine while I am at work or not at work while I am representing Midland Brewing Company and hiding – and telling me that my Facebook, people can log on and see that, and as I'm in a leadership role, that sometimes people do that, and that I should hide it, and I did.

ECF No. 16-4 at PageID.352. Plaintiff testified that after this alleged conversation, he changed his hair style from "spiky" to "combed over." He testified that he maintained the same "combed over" hairstyle from 2018 until the time of his deposition. ECF No. 16-4 at PageID.218–19. Plaintiff acknowledged that he did not maintain any notes from his conversation about Reynolds' request that he act or look more masculine. ECF No. 16-4 at PageID.354. The record also does not include a full review of changes to his Facebook page during this timeframe but rather consists of two lists of posts that appear to be selected from a Facebook activity report. *See* ECF Nos. 16-15; 16-20; 16-38. He believes the "Reynolds Conversation" occurred before his "very first promotion." ECF No. 16-4 at PageID.364. He testified that no one ever discussed his hairstyle or masculinity after the conversation with Reynolds. ECF No. 16-4 at PageID.365–66.

On September 11, 2018 Reynolds promoted Plaintiff to shift lead.[1] ECF No. 16-4 at PageID.235. In November 2018, he was promoted to floor leader. ECF No. 16-4 at PageID.243.

Plaintiff testified that two months after being promoted to floor leader, he "had no work/life balance . . . and everything that was going on at Midland Brewing Company was just super overwhelming." ECF No. 16-4 at PageID.253. He claimed that "[MBC] was just weighing on [him] every single day that [he] was there." *Id.* And so, in January 2019, Plaintiff submitted his letter of resignation to Reynolds. Reynolds, however, persuaded him to remain at MBC. ECF No. 16-4 at PageID.251–52. Afterward, he texted Reynolds, "I will start working on thinking before

---

[1] Shift lead is "[a]n hourly manager" who "essentially close[s] the restaurant and run[s] the shift." ECF No. 16-4 at PageID.235–36.

reacting. I love my job at MBC and I love having you as my mentor." ECF No. 16-4 at PageID.253–54; ECF No. 16-6 at PageID.392. He testified during his deposition that he meant what he said. ECF No. 16-4 at PageID.254. Later that January, Plaintiff was promoted to Front of House ("FOH") Operations Manager, the second highest position in the restaurant. ECF No. 16-4 at PageID.255; ECF No. 16-22.

As FOH Operations Manager, Plaintiff's duties included preparing weekly staff schedules, confirming that opening and closing duties are completed, "assist[ing] in training new employees," reconciling the cash drawer, reporting personnel, customer, or equipment issues to Restaurant GM or Property Manager, resolving customer concerns, and "enforc[ing] and follow[ing] all restaurant rules and processes." ECF No. 16-2 at PageID.154. The job description also provides the FOH Operations Manager shall "manage themselves and others in a professional manner" and have "impeccable personal hygiene as well as high work and safety standards." *Id.*

In February 2019, only a few weeks after being promoted to FOH Operations Manager, Plaintiff was offered employment at Old Chicago, another restaurant located in Midland. ECF No. 16-4 at PageID.259. He spoke with Reynolds and Kepler about the offer, who in turn offered to increase his salary to stay at MBC. ECF No. 16-4 at PageID.259–60, 62. Plaintiff also testified that during this February 2019 meeting with Kepler, Plaintiff complained about his July 2018 conversation with Reynolds regarding Plaintiff's masculinity and sexual orientation. ECF No. 16-4 at PageID.367–68. He testified that Kepler appeared upset about his report and explained, "I will make things right with [Reynolds], I will have [Reynolds] make things right with you." ECF No. 16-4 at PageID.369–70. He also encouraged Plaintiff to stay at MBC. *Id.* Plaintiff further testified that Kepler did not tell Plaintiff to change his appearance or hide anything about his sexual orientation. ECF No. 16-4 at PageID.375–76.

Plaintiff had a meeting with Reynolds in February 2019 after his discussion with Kepler. He testified that this conversation with Reynolds and subsequent email communications with Kepler were positive. ECF No. 16-4 at PageID.264–65. As of April 27, 2019, Kepler and Plaintiff "had a discussion about [Plaintiff] continuing to work for MBC through at least the new year." ECF No. 16-4 at PageID.281.

The record includes multiple text message and email discussions between Plaintiff and Reynolds throughout his time at MBC. On June 11, 2018, Plaintiff exchanged text messages with Defendant Donna Reynolds, describing her as "the best boss ever." ECF No. 16-4 at PageID.229–31; ECF No. 16-5 at PageID.385. Around December 2018, he texted Reynolds and told her, "You are honestly one of the best bosses I've ever had, and not only to me but to our entire staff and I feel like sometimes it's taken for granted." ECF No. 16-4 at PageID.246. He testified during his deposition that he meant what he wrote. *Id.*

**C.**

The MBC handbook states,

> MBC shall regard an employee's job abandoned and the employee terminated when the employee is absent from work without official leave approval from management for one or more consecutive shifts.

ECF No. 16-4 at PageID.222. The handbook further states, "Extremes in hairstyles, makeup, jewelry, and clothing are not permitted at work." ECF No. 16-4 at PageID.223. Finally, it provides, "[h]air should be clean, neatly groomed and pulled away from face." ECF No. 16-4 at PageID.223.

Plaintiff testified that he "probably" wore earrings to his MBC interview, which at the time included two studs and a bar through his right ear. ECF No. 16-4 at PageID.218–19. In August 2018, Plaintiff texted Reynolds,

> Do you think I should take my lobe earrings out too? I don't have a problem either way. I was thinking of ways to cover my neck tattoo, but I've honestly been wanting

- 5 -

to look into laser removal and have been thinking about it for the last year or so. Maybe around tax return season I'll be able to start that. I was not in the right mind when I got that done, the tattoo artist should've not done that lol. I've been wanting it removed even before I worked at MBC, for professional reasons. But let Dave know that I'll be working on that also and I am on the same page. Thanks again Donna, you're awesome.

ECF No. 16-5 at PageID.389. Reynolds responded, "Wow Ryan. Don't do anything drastic! Lol! I appreciate the thought though. Maybe yes on the ears and then we can talk about the rest." ECF No. 16-5 at PageID.389. Plaintiff responded, "Okay perf! But for real Donna. I can't be a 30 year old with a neck tattoo. [neutral face emoji]." ECF No. 16-5 at PageID.390.

## D.

Despite Plaintiff's quick rise at MBC, his work was not without criticism. In January 2019, there was an issue with an employee's hair being found in a customer's food, as well as an instance where the point of sale system went down. In response to both issues, Reynolds sought better communication from Plaintiff. ECF No. 16-4 at PageID.256–58; ECF Nos. 16-24 at PageID.499–501.

In April 2019, Reynolds emailed Plaintiff telling him not to interview or hire any back of house staff unless she is involved. ECF No. 16-4 at PageID.272–73; ECF No. 16-26 at PageID.508. On May 7, 2019, Reynolds learned that Plaintiff brought the wrong resume to an interview with a prospective employee. ECF No. 16-4 at PageID.282. Later, on May 20, 2019, Kepler emailed Reynolds stating,

> Ryan [should] not [be] focused on a weekly promotion and certainly not about beer. We are not doing a flight week. Ryan [should be] focused on front of house execution, so schedule and labor. . . . Ryan needs to demonstrate that he can stay in his lane and perform.

ECF No. 16-4 at PageID.286; ECF No. 16-30 at PageID.517.

Defendants' frustrations with Plaintiff culminated when Plaintiff missed a mandatory meeting and shift without prior notification. Plaintiff was required to attend a "Problem Solving" meeting on May 30, 2019 with "high level [staff] members" and did not request permission or inform anyone that he would miss the meeting. ECF No. 16-11 at PageID.411. He also did not show up to work, as scheduled, that evening. ECF No. 16-11 at PageID.411. Plaintiff knew about the meeting and his shift in advance. ECF No. 16-32 at PageID.523. He texted co-worker Megan Moody the day before. Ms. Moody reminded him of the meeting, to which he replied, "Fuckkk. What time is it? I need to find a sitter for the crack of fucking dawn. Those meetings are such a waste of time for MBC." ECF No. 16-32 at PageID.523. He further stated,

> That's an all day long shift. And it's trivia night. Why do they not think about things like this? I'm going to get us out of it because I'm going to have to work with you for a little bit tomorrow night and I will not be able to find or even want to leave [daughter] with a sitter from sun up to sun down.

*Id.* Plaintiff testified that he received verbal permission from Reynolds to skip the meeting to care for his daughter, but Reynolds and Kepler both swore in affidavits that no permission was granted. ECF No. 16-11 at PageID.411; ECF No. 16-12 at PageID.413.

On May 31, 2019 Plaintiff was terminated. The termination letter states,

> Among other issues, and finally due to your absence and failure to notify management, we have decided to terminate your employment at Midland Brewing Company.

> You will receive your scheduled paycheck on June 7, 2019 if all MBC property (including your laptop and keys) is returned to Michelle at 233 E. Larkin St. Ste. 2, Midland. Please do not attempt to bring any property to Midland Brewing Company.

ECF No. 16-35 at PageID.531. After he was terminated, Plaintiff sent an email to Jerry McVety, a restaurant consultant hired by MBC, outlining his frustration with Reynolds. ECF No. 16-36. He explained that he "was not scheduled to work [the day he missed work]," that "Donna [Reynolds]

lies about the waste numbers every week, right to Dave's face," and that Reynolds was not the employee Kepler believed her to be. Plaintiff also called a former co-worker's wife to inform her that the co-worker would soon be terminated. ECF No. 16-4 at PageID.304. A few days later, Kepler emailed Plaintiff and stated,

> Your release as explained, was primarily due to you not showing up at work. But prior to your termination and since, you have continued to disparage and harass several employees of Midland Brewing Company.

ECF No. 16-37 at PageID.538.

### E.

After he was terminated, Plaintiff did not inform his friends or former coworkers that he believed he was terminated because of the request to appear more masculine or to hide his sexual orientation. ECF No. 16-4 at PageID.317. He testified that he did not want to discuss the subject because he was trying to obtain legal counsel and did not want information being relayed to MBC management. ECF No. 16-4 at PageID.359. Instead, Plaintiff informed others that he was fired because Reynolds was insecure. ECF No. 16-4 at PageID.314. He explained, "I was about to go to Dave about [Reynolds] and . . . boom now I'm gone." ECF No. 16-4 at PageID.315. He also complained that Reynolds "acted discriminatory toward people" based upon whether she liked them. ECF No. 16-4 at PageID.315–16. That said, Plaintiff agreed that he believed Kepler made his decision to terminate his employment because he "honestly thought [Plaintiff] missed a mandatory meeting and a shift." ECF No. 16-4 at PageID.354.

### F.

At Plaintiff's request, the EEOC filed a Charge of Discrimination in August 2019. ECF No. 16-4 at PageID.181–82. Plaintiff's EEOC charge states,

> In July 2018, the General Manager told me that I should 'hide' my sexual orientation to include removing my relationship status from my Facebook account.

She claimed she believed the Owner would be uncomfortable if I did not otherwise. I did as she suggested although it gravely impaired my relationship with my partner. I later found out the Owner was well aware of my sexual orientation and did not appear to have an issue with it. The General Manager would call me in during my days off, reassign her duties to me and she paid me less than any of the other managers and some hourly employees. I complained to the Owner about the General Manager's unfair treatment and hospitality. I believe the General Manager was made aware of my complaint although her behavior continued. On or about May 27, 2019, she terminated me.

I believe I was discriminated against, subjected to a different terms and condition of employment and discharged because of my sex (male) and for not conforming to sex/gender stereotypes, in violation of Title VII of the Civil Rights Act of 1964, as amended.

ECF No. 16-13 at PageID.416–17.

On September 24, 2019, the EEOC closed its file on the charge because it was "unable to conclude that the information obtained establishes violations of the statutes." ECF No. 16-13 at PageID.418.

## G.

Plaintiff testified that he and his partner Drew Rohlfs "officially became a couple on Facebook" on May 6, 2017 but that their "relationship status" was later removed before being added back on October 2, 2018. ECF No. 16-4 at PageID.238. Prior to Plaintiff re-adding his relationship status on Facebook, he posted an anniversary post on his public Facebook page on May 7, 2018. ECF No. 16-4 at PageID.240–42. Plaintiff also referenced his sexual orientation multiple times on his social media, including using the hashtags, "#gayswithkids" and "@gays_with_kids." ECF No. 16-3 at PageID.161, 163. He also posted about his work on Instagram. ECF Nos. 16-3 at PageID.157, 158, 162.

## H.

In response to Plaintiff's allegations, Reynolds swore in an affidavit,

> At no point during his employment did I tell Mr. Boshaw to change his appearance,
> including telling him to appear more masculine.
> [] At no point during his employment did I tell Mr. Boshaw to hide or remove his
> relationship status on his social media accounts.

ECF No. 16-11 at PageID.410.

Additionally, Mr. Kepler swore in an affidavit that he met with Plaintiff in February 2019

to discuss Plaintiff's job offer from the Old Chicago restaurant. He averred,

> At this time, Mr. Boshaw and I discussed his compensation, including his salary
> and benefits. At no point in this conversation did Mr. Boshaw bring up any
> conversation he had with Ms. Reynolds about his sexual orientation, his appearance
> at work, his masculinity, or about his social media profiles.

ECF No. 16-12 at PageID.413. He also averred that he "made the decision to terminate Mr.

Boshaw's employment, effective May 31, 2019, after he did not attend the Problem Solving

training or his shift on May 30, 2019." ECF No. 16-12 at PageID.414.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the

record for evidence "which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party

who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all

reasonable inferences in favor of the non-movant and determine "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Id.* at 251–52. This standard is "very close to the reasonable jury

directed verdict standard." *Id.* (internal quotations omitted). "[T]his standard provides that the

- 10 -

mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The requirement is that there be no *genuine* issue of *material* fact." *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) (citing *Anderson*, 477 U.S. at 247–48) (emphasis in original). As the Sixth Circuit has explained,

> While the burden is initially on the moving party to show the absence of any genuine issues of material fact, the nonmoving party must then present significant probative evidence to do more than show that there is some metaphysical doubt as to the material facts to defeat the motion. The court may grant summary judgment if the nonmovant's evidence is insufficiently probative to create a genuine issue of fact. When the nonmovant does not effectively address the movant's assertion of a fact, the district court may consider the fact undisputed for purposes of the motion.

*Ondo v. City of Cleveland*, 795 F.3d 597, 603 (2015) (internal citations and quotations omitted).

### III.

The Amended Complaint includes two counts of sex discrimination under Title VII and the ELCRA, two counts of retaliation under Title VII and the ELCRA, and one count of civil conspiracy under the ELCRA. ECF No. 9.

### A.

### i.

In Count I Plaintiff alleges that Defendants discriminated against him on the basis of sex in violation of Title VII. In Count II, he alleges that Defendants discriminated against him on the basis of sex in violation of the ELCRA.

Plaintiff articulates two theories as to how Defendants violated Title VII and the ELCRA. First, Plaintiff argues that he was asked to appear more masculine. Second, Plaintiff argues that he was asked to remove his homosexual relationship status from Facebook in order to receive a promotion. The first theory is based upon Plaintiff's sex. It will be addressed under both Title VII

and the ELCRA. Plaintiff's second theory is based upon his sexual orientation. This theory is only recognized under Title VII, not the ELCRA.

Traditionally, sex discrimination under Title VII and the ELCRA are analyzed under the same legal framework. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652–53 (6th Cir. 2012) ("cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases."). In *Bostock v. Clayton County*, the Supreme Court held that Title VII prohibits discrimination based on sexual orientation. 140 S. Ct. 1731, 1737 (2020) ("An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids."). However, this Court is unaware of caselaw—and the parties have not located any—extending *Bostock* to the ELCRA.

Prior to *Bostock*, the Michigan Court of Appeals held that the ELCRA did not apply to discrimination based upon sexual orientation, based in part on a review of federal case law regarding Title VII. *Barbour v. Department of Social Services*, 497 N.W.2d 216, 217–18 (Mich. Ct. App. 1993) ("[T]he [trial] court correctly concluded that harassment or discrimination based upon a person's sexual orientation is not an activity proscribed by the [ELCRA]."). Plaintiff argues that because of the change in federal law, the ELCRA should now be read to prohibit discrimination due to sexual orientation. He argues,

> Courts of the State of Michigan defer to federal cases interpreting Title VII to determine whether it applies to discrimination because of sexual orientation. On June 19, 2020 the Michigan Attorney General issued direction to the Michigan Department of Civil Rights to wait for the Supreme Court's decision in Bost[o]ck and apply same to claims of discrimination based on sexual orientation. The Courts of this state will apply the reasoning from Bost[o]ck to claims under the ELCRA.

ECF No. 19 at PageID.667–68.

While the same analysis generally applies to Title VII and ELCRA claims, and the Michigan Court of Appeals previously considered federal case law in *Barbour*, Title VII and ELCRA are not identical. As Plaintiff explains, "[t]he ELCRA has one significant difference to Title VII: the ELCRA provides for liability for individual discriminating managers, while Title VII does not." ECF No. 19 at PageID.668 (citing *Elezovic v. Ford Motor Co.*, 472 Mich. 408 (2005)).

State courts are the ultimate arbiters of state law. "[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236–37. If a state's highest court has not spoken on an issue,

> it is the duty of the [federal court] in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of 'general law' and however much the state rule may have departed from prior decisions of the federal courts. Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Id.*

Plaintiff makes a compelling argument that if Michigan courts previously looked to federal law when determining the boundaries of the ELCRA, that Michigan courts would continue to look to federal law for guidance on the question of discrimination based upon sexual orientation. But that is not Michigan law. Indeed, on December 7, 2020, the Michigan Court of Claims also recognized that under Michigan precedent, the ELCRA does not encompass sexual orientation discrimination. *See Rouch World, LLC v. Michigan Department of Civil Rights*, ECF No. 20-2.

Plaintiff's sexual orientation theory under Count II lacks merit because Michigan law does not prohibit discrimination based upon sexual orientation.

### ii.

Under Title VII or the ELCRA, "the plaintiff must establish by a preponderance of the evidence that she was the victim of intentional or purposeful discrimination." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988). "[A] plaintiff is required to demonstrate that the adverse employment decision would not have been made 'but for' her sex. Put differently, the plaintiff must show that the 'discriminatory intent more likely than not was the basis of the adverse employment action.'" *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) (internal citation omitted).

Discriminatory treatment can be established by direct evidence or indirect and circumstantial evidence. *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 192–93 (Mich. 2003). The Michigan Supreme Court defined direct evidence as "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (quotations omitted). The court further held "[i]n a direct evidence case involving mixed motives, i.e., where the adverse employment decision could have been based on both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a 'substantial' or 'motivating' factor in the decision." *Id.*

A plaintiff may also prove sex discrimination by presenting indirect evidence under the burden-shifting approach as articulated in *McDonnell Douglas*. *McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Sniecinski*, 666 N.W.2d at 193. To establish a prima facie case, the plaintiff must establish that "(1) she belongs to a protected class, (2) she suffered an adverse employment action,

- 14 -

(3) she was qualified for the position, and (4) her failure to obtain the position occurred under circumstances giving rise to an inference of unlawful discrimination." *Sniecinski*, 666 N.W.2d at 193. A plaintiff can satisfy the fourth element by demonstrating that she was "treated differently from similarly situated employees outside the protected class." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004).

"If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory rationale for the adverse employment action." *In re Rodriguez*, 487 F.3d 1001, 1008 (6th Cir. 2007). "Once the employer does so, the burden shifts back to the plaintiff to demonstrate that the articulated reason is a mere pretext for discrimination." *Id.* Pretext may be demonstrated by "showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

### iii.

Plaintiff claims that he has direct evidence of discrimination by Defendants. *See* ECF No. 19 at PageID.669. Plaintiff's masculinity theory of sex discrimination will be analyzed first. In his response brief, he argues, "Reynolds told Plaintiff that he could not be promoted unless he acted more masculine . . . which, plainly, is direct evidence of discrimination." ECF No. 19 at PageID.669 (emphasis omitted). Plaintiff explains that he styled his hair differently, "combed over" rather than "spiked up," after his conversation with Reynolds. ECF No. 16-4 at PageID.344–48. He testified that he wore the combed over style both to work and after work when he worked at MBC and he still combs it over because he "ha[s] so much anxiety from working there." *Id.* Plaintiff, in his Complaint and his Response Brief, offers no additional evidence of this claim. In

contrast, Defendants, in their Motion and Reply, argue that "Plaintiff has no evidence that Reynolds told him to 'just act a little more masculine' other than his own testimony. Even if this Court accepts that such a conversation took place, it could not constitute direct evidence of discrimination." ECF No. 16 at PageID.136. Defendants explain that the Michigan Court of Appeals has held that

> While a single remark from a supervisor in the context of a discussion regarding plaintiff's termination, even if the statement might be subject to multiple interpretations, is sufficient to constitute direct evidence, and the remark's weight and believability are matters for the fact-finder to determine, a stray remark that is outside the context of a termination decision is not necessarily probative of an employer's discriminatory intent.

*Wolfgang v. Dixie Cut Stone & Marble, Inc.*, 2010 WL 199595 at *2 (Mich. Ct. App. 2010) (internal citations omitted). Four factors must be considered,

> (1) whether the remark was made by a person involved in the termination decision, (2) whether the remark was made during the decision making process, (3) whether the remark was vague, ambiguous, or isolated, and (4) whether the remark was proximate in time to the termination.

*Id.* In this case, the remark was alleged to have been made by Reynolds, not Kepler, in the context of a discussion about Plaintiff's promotion, not his termination, and it allegedly occurred seven months prior to his termination. This alleged comment by Reynolds occurred, according to Plaintiff, once and was never the topic of conversation again. This evidence is insufficient to demonstrate direct evidence of sex discrimination.

In response, Plaintiff cites to *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Plaintiff argues the Supreme Court found a Title VII violation when the employer was denied partnership status because she was too "macho." ECF No. 19 at PageID.665–66. Plaintiff analogizes the instant case, arguing, "[t]he Supreme Court has told us that delaying a woman's promotion because she acts too masculine is a violation of Title VII. It follows that delaying a man's promotion because

he does not act masculine enough does also." ECF No. 19 at PageID.666 (emphasis omitted).

Plaintiff correctly notes that an employer who acts upon a belief based on sex stereotyping may be

grounds for a sex-based Title VII discrimination claim. However, this case is distinguishable from

*Price Waterhouse*. In *Price Waterhouse*, the plaintiff "proved that Price Waterhouse invited

partners to submit comments; that some of the comments stemmed from sex stereotypes; that an

important part of the Policy Board's decision on Hopkins was an assessment of the submitted

comments; and that Price Waterhouse in no way disclaimed reliance on the sex-linked

evaluations." *Id.* at 251.

In this case, there is no evidence that Plaintiff's promotions were denied or even delayed.[2]

In fact, exactly the opposite occurred. Plaintiff was hired as a server on March 2, 2018, and then

advanced again in September of 2018, November of 2018, and February of 2019. Plaintiff does

not dispute these material facts or advance any suggestion for why Defendants would do so.

Further, MBC has a gender-neutral policy regarding the appearance of their employees. It

is clear that  in the summer of 2018, prior to Plaintiff's promotion to shift lead, Reynolds and

Plaintiff discussed his earrings and neck tattoo. However, it is also true that Defendants provided

evidence of Plaintiff's negative work performance prior to his termination. After Plaintiff was

promoted to FOH Operations Manager, Plaintiff was critiqued for not communicating concerns

quickly enough to Reynolds (the employee hair in the food problem and the point of sale

breakdown), he was told to include Reynolds when hiring back of house staff, he brought the

---

[2] Even if Plaintiff developed the argument that his promotion was predicated upon his change in appearance
and concealment of his sexual orientation, he proffers no facts that his promotion was delayed, resulting in
reduced pay, as a result of these alleged changes. *See Samuel v. Metropolitan Police Department*, 258 F.
Supp. 3d 27, 43 (D.C. 2017) ("When an employee ultimately receives the sought-after promotion but claims
that her employer discriminatorily interfered with the application process, the employee must show that she
was delayed in receiving an increase in income or other employment benefit, and that the gap in income
was not remedied after the fact.").

wrong resume to an interview, and Kepler expressed his frustration that Plaintiff did not "stay in his lane." Finally, Plaintiff missed a mandatory meeting for higher level employees and a shift.[3] Plaintiff's only evidence of sex discrimination is his testimony, which is fundamentally contradicted by his progression within MBC after the alleged conversation.

Therefore, Defendants' Motion for Summary Judgment as to Counts I and II under Plaintiff's masculinity theory will be granted.

### iv.

Plaintiff's second theory of direct evidence of sex discrimination is predicated on Reynolds allegedly informing him that he would not be promoted unless he removed his relationship status from Facebook. ECF No. 19 at PageID.667. As discussed, *supra*, this sexual orientation theory only applies to Count I. *See* Section III.B.i. Plaintiff's argument is that "Reynolds refused to consider Plaintiff for a promotional opportunity unless he removed reference to his homosexual relationship from his public facebook." ECF No. 19 at PageID.667. In their Motion, Defendants argue that Plaintiff's only evidence, once again, is his testimony regarding the alleged conversation with Reynolds in July 2018. Plaintiff offers no further evidence in his Response. While the record itself does not appear to include Plaintiff's entire Facebook history, he testified that on October 2, 2018 he "put [his relationship status with his partner] back on" Facebook. ECF No. 16-4 at PageID.238–39.  In addition, he posted on Instagram in December 2018 and included the hashtag, "#gayselfie." ECF No. 16-3 at PageID.160. Finally, Plaintiff testified that he was told by Reynolds that Kepler was aware of and did not object to his sexual orientation. ECF No. 16-4 at PageID.182–83. Plaintiff has no evidence, beyond his testimony, that the alleged conversation occurred. He

---

[3] Plaintiff argues that there is a factual question about whether he was given permission to miss the meeting. However, he has no evidence of this permission. In fact, there are text messages between Plaintiff and Ms. Moody hours prior to the meeting where they discussed that it was mandatory to attend and Plaintiff expressed no interest in attending.

also publicly shared his sexual orientation and the fact that he was in a relationship with a male partner on two social media sites prior to his promotion in early 2019.  He further testified that he was told that Kepler was not concerned with his sexual orientation and he believed that to be true. Defendants have demonstrated there is no genuine issue of material fact regarding Plaintiff's sexual orientation and his subsequent termination. Plaintiff's sexual orientation theory for Title VII for Count II also fails. Therefore, Count II will be dismissed.

**B.**

In Count III, Plaintiff alleges Defendants retaliated against him in violation of Title VII.

**i.**

The Sixth Circuit applies the McDonnell Douglas framework to Title VII retaliation claims. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001); *Steiner v. Henderson*, 121 F. App'x 622, 625 (6th Cir. 2005). In order to make a prima facie case of Title VII retaliation, a plaintiff must prove: "(1) [s]he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Steiner*, *supra* (internal quotes omitted). "The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protects of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

If Plaintiff establishes a prima facie case of retaliation, the burden shifts to Defendants "to articulate some legitimate, nondiscriminatory reason" for terminating Plaintiff. *McDonnell Douglas*, 411 U.S. at 802. If Defendants met their burden, then Plaintiff must demonstrate that Defendants' rationale is pretextual.

**ii.**

Defendants argue that Plaintiff cannot show retaliation under Title VII because he did not engage in protected activity and any alleged protected activity was not causally connected to his termination. ECF No. 16 at PageID.141–43. In response, Plaintiff argues that the protected activity was his February 2019 conversation with Kepler and the subsequent conversation with Reynolds. ECF No. 19 at PageID.674. He argues that he "told [Kepler] that he was dissatisfied that Defendant Reynolds' had made him conceal his sexuality and involvement in a homosexual relationship in order to receive his promotion." *Id.* Plaintiff further contends that Defendants not only terminated his employment, but the "hyper-scrutiny" he received after the February conversations qualify as adverse employment actions. *Id.* at PageID.675–76. Plaintiff analogizes the instant case with *Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014). In *Laster*, the plaintiff filed a complaint of racial discrimination to human resources and then alleged he "was denied training opportunities and privileges, singled out for violating at least two department polices that were selectively enforced against him, and disciplined more harshly than his peers for identical violations." *Id.* at 732. The Court of Appeals held that "[f]acing heightened scrutiny, receiving frequent reprimands for breaking selectively enforced policies, being disciplined more harshly than similarly situated peers, and forced to attend a pre-determination hearing based on unfounded allegations of wrongdoing might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*

Even if the February 2019 meetings were protected conduct, Plaintiff cannot demonstrate that his termination was causally connected to his protected activity. Defendants cite evidence that he tried to expand his job duties multiple times, communicated poorly with Reynolds, was unprepared for an interview, and missed a mandatory meeting (which, even if he believed he

received permission to miss, was not adequately communicated to Reynolds and Kepler, providing further evidence of his documented communication issues).

Plaintiff's alternate employment action theory, based upon alleged hyper scrutiny after the February 2019 conversations, does not save Plaintiff's claim. Plaintiff testified that he could not do anything right after February 2019 and that his work was hyper-scrutinized. However, the evidence in the record demonstrates that Plaintiff was asked to not hire Back of House staff without Reynolds' involvement (outside the scope of his position), that he brought the wrong resume to an interview, that he attempted to offer a beer promotion (again, outside the scope of his position), and that he ultimately missed a mandatory meeting and shift. With the exception of the May 30, 2019 meeting and shift, Plaintiff does not argue that the correction given by Reynolds was inappropriate, nor does he offer further evidence of hyper-scrutiny. As for the May 30, 2019 meeting, Plaintiff's sole evidence is his testimony, which is rebutted not only by Defendants' affidavits but his acknowledged employment errors.

Additionally, Plaintiff argues that he was treated differently than Ms. Moody, the bar manager who was a "no call, no show" multiple times, but was not fired. However, Plaintiff's position was not the equivalent of Ms. Moody's. Plaintiff was the Front of House Manager, the second highest position at the restaurant. This behavior does not rise to the level of scrutiny alleged in *Laster*. Plaintiff's claim fails under this alternate theory of adverse action because Defendants have demonstrated that there is no genuine issue of material fact as to whether the alleged hyper-scrutiny and selective enforcement Plaintiff allegedly received were adverse employment actions.

## C.

The ELCRA prohibits retaliation or discrimination against an individual because that person has opposed a violation of the act, made a complaint, or participated in an investigation

under the act. MCL § 37.2701(a). The analysis for an ELCRA and Title VII retaliation claim are identical. *Kuhn v. Washtenaw County*, 709 F.3d 612, 627 (6th Cir. 2013). As this Court held regarding Count II, discrimination based upon sexual orientation is not a predicate for an ELCRA claim. In his Response Brief, Plaintiff "maintains that, in February of 201[9], he spoke to Defendant Kepler and told him that he was dissatisfied that Defendant Reynolds' had made him conceal his sexuality and involvement in a homosexual relationship in order to receive his promotion. Shortly thereafter, he discussed his concerns regarding same with Defendant Reynolds herself at the Red Keg. This was all protected conduct." ECF No. 19 at PageID.674. This alleged discrimination is based upon Plaintiff's sexual orientation, not upon Reynolds' alleged request to look more masculine. As discussed, *supra*, the ELCRA does not prohibit discrimination based upon sexual orientation. Therefore, Defendants' alleged retaliation due to Plaintiff's sexual orientation claim is not a valid ELCRA retaliation claim.  Defendants' Motion for Summary Judgment will be granted as to Count IV.

### D.

Defendants argue that Plaintiff's Count V, civil conspiracy, fails because there is no underlying tort and even if there were, there are no identified facts to support a conspiracy claim. ECF No. 16 at PageID.145–46. The ELCRA provides,

> Two or more persons shall not conspire to, or a person shall not: (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

§ 37.2701(b).

Defendants argue the appropriate test for ELCRA civil conspiracy has four factors, "(1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means." *Id.* (citing *Mays v. Three Rivers Rubber*

*Corp.*, 135 Mich. App. 42, 48 (1984)). In response, Plaintiff protests that Defendants cited the wrong standard. ECF No. 19 at PageID.677–78. He contends that Count V is a civil conspiracy claim under the ELCRA and cites the statutory language. *Id.* He offers no facts or caselaw that would corroborate the assertion, only the conclusion. He does not provide any legal authority providing the elements for the claim. In their Reply, Defendants explain that "[c]onspiracy claims brought pursuant to ELCRA are analyzed under the framework of Michigan civil conspiracy law." ECF No. 20 at PageID.697.

Defendants are correct. In *Wrobbel v. International Brothers of Electrical Workers, Local 17*, the Michigan Court of Appeals analyzed an ELCRA civil conspiracy claim. 638 F. Supp. 2d 780 (Mich. Ct. App. 2009). The court defined a civil conspiracy as a "combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Id.* at 794 (quoting *Admiral Ins. Co. v. Columbia Casualty Ins.*, 486 N.W.2d 351, 358 (Mich. Ct. App. 1992). "Thus, a plaintiff must present evidence of an alleged conspirator's discriminatory animus or intent under § 701(b), in addition to some concerted action to aid, abet, incite, or compel someone to violate a person's civil rights." *Id.* at 794. Chief Judge Hood cited the same civil conspiracy caselaw when analyzing an ELCRA civil conspiracy claim. *See Pineau v. Comau PICO*, 2006 WL 846750 at *7–8 (E.D. Mich. 2006).

Defendants have demonstrated that there is no genuine issue of material fact regarding Plaintiff's claims of sex discrimination under Title VII and the ELCRA. Plaintiff argues that "[b]oth Kepler and Reynolds expressed anger towards Mr. Boshaw after he complained," that Reynolds verbally approved Plaintiff's absence from the May 30, 2019 meeting, and "Kepler knew this as early as May 31, 2019." ECF No. 19 at PageID.678. The "anger" Plaintiff alleges, assuming it occurred as Plaintiff testified, occurred in two distinct meetings and Plaintiff even testified that

Kepler told him he would make things right with Reynolds. This is not the language of a sexual orientation discrimination conspiracy. Further, the evidence Plaintiff cites for his belief that Kepler was aware that Reynolds allegedly approved his absence at the meeting is an email Plaintiff sent after he was terminated. *See* ECF No. 16-36. Defendants have demonstrated there is no genuine issue of material fact regarding Plaintiff's civil conspiracy claim. Defendants' Motion will be granted as to Count V.

## E.

Defendants also include an argument that, to the extent that Plaintiff alleges a hostile work environment claim, it too fails. ECF No. 16 at PageID.140–41. In response, Plaintiff argues that he "was told that in order to be suitable for promotion he needed to act more 'masculine' and remove indications of his homosexuality from his personal facebook. This created a hostile and offensive environment for him." ECF No. 19 at PageID.670–71. However, Plaintiff does not identify a separate claim for hostile work environment in his original or amended complaint. Defendants sole rationale that Plaintiff may have alleged a hostile work environment claim is the fact that Plaintiff used the phrase "at-work harassment" when describing his Title VII and ELCRA sex discrimination claims in the Amended Complaint. That phrase alone is insufficient to state a hostile work environment claim, a distinct claim from a claim of sex discrimination. Thus, Plaintiff did not allege a hostile work environment claim and the claim will not be addressed.

## IV.

Plaintiff, in addressing the standard of review, cautions the Court, appropriately, that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." ECF No. 19 at PageID.662. He proceeds to argue that "[t]he Defense ignores this standard entirely. They ask the Court to ignore Boshaw's

version of events, in favor of theirs, because they find him to lack credibility. But, on summary judgment, they cannot ask the Court to assess his credibility!" *Id.* at PageID.663 (emphasis omitted). In effect, Plaintiff argues that because he has furnished a "version of the events" that contrasts with that of Defendants, a genuine issue of fact necessarily exists. Not so, however, if an objective assessment of the evidence demonstrates evidence that is "so one-sided that one party must prevail as a matter of law," which is the conclusion that this Court has reached for the reasons outlined in the Opinion. Plaintiff's "version of the events" is his testimony about Reynolds' criticism of his behavior as being less than "masculine"[4] and his need to hide his sexual orientation early in his tenure as an MBC employee. From this conversation, Plaintiff contends that MBC management disapproved of his sexuality and, accordingly, sought to get rid of him. But simply saying so, alone, in light of the significant probative evidence to the contrary, does not a "genuine issue of material fact" make.

Here, Plaintiff was employed by MBC for over 14 months. Plaintiff furnishes no explanation for how a reasonable juror could conclude that Reynolds and Kepler were discriminating against him because of his sexuality by promoting him and increasing his salary, a process he describes as "to say the least, meteoric." ECF No. 19 at PageID.656. After Plaintiff's alleged conversation with Reynolds, he expresses to Reynolds that "I love you as my mentor" and later describes her as "the best boss ever." He does not dispute that Kepler made repeated efforts to retain him, not get rid of him, and that Kepler had no problem with his sexual orientation. Indeed, he concedes that Kepler's decision to terminate his employment was based on his honest, good

---

[4] It is difficult to understand how lacking "masculinity" is necessarily a proxy for being male and gay given the number of accomplished, self recognized gay athletes, actors, political leaders and business leaders who do not "lack masculinity." Further, Plaintiff admits at his deposition that he is unsure how having spiky hair identifies him as a homosexual. ECF No. 16-4 at PageID.347. However, Plaintiff testified that it "apparently . . . mattered" to Reynolds. *Id.*

faith belief that he missed a mandatory meeting and that he did not show up for his scheduled shift. In short, the evidence, including Plaintiff's admissions, is so one-sided that there is no genuine issue of material fact.

One issue remains to be addressed in this context. Defendant contends that "this is a vexatious and non-meritorious case which should have never been filed." ECF No. 16 at PageID.147. They contend in a single sentence, without further elaboration, that "[p]ursuant to 42 U.S.C. §2000e-5k and *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978) attorneys' fees should be awarded." ECF No. 16 at PageID.147. Plaintiff furnishes a three-sentence response that given the significant factual questions, one cannot conclude that Plaintiff's "version of events" was frivolous or unreasonable. However, to Plaintiff's earlier point in addressing the standard of review, the Court has sought to avoid assessing Plaintiff's motives or his credibility for testifying as he has. What can be said at this juncture, however, is that Plaintiff has not done more than "show there is some metaphysical doubt about the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Without more, the Court cannot conclude that Plaintiff's testimony is not credible and that his "version of the events" is frivolous. Accordingly, Defendant's request for attorney fees will be denied.

## V.

Accordingly, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 16, is **GRANTED**.

It is further **ORDERED** that Plaintiff's Amended Complaint, ECF No. 9, is **DISMISSED**.

It is further **ORDERED** that Defendants' Request for Attorney Fees is **DENIED**.

Dated: March 30, 2021                                          s/Thomas L. Ludington
                                                              THOMAS L. LUDINGTON
                                                              United States District Judge